UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KEVIN W. TOBIN,<br>    Plaintiff<br><br>v.<br><br>LIBERTY LIFE ASSURANCE<br>COMPANY OF BOSTON and<br>LIBERTY MUTUAL<br>INSURANCE COMPANY,<br>    Defendants | Civil Action No. 05-11179DPW |

### FIRST AMENDED COMPLAINT

Plaintiff files this first amended complaint as of right pursuant to Federal Rule of Civil Procedure 15(a). The Complaint has not yet been served on the defendants and no responsive pleading has been filed. The Complaint is amended solely to add the exhibits inadvertently omitted from the original filing.

1. Plaintiff Kevin W. Tobin (hereinafter "Tobin") is an individual and a resident of Scituate, Plymouth County, Massachusetts.

2. Defendant Liberty Life Assurance Company of Boston was and is a duly organized and existing corporation chartered under the law of the State of Massachusetts with its principal place of business at Boston, Massachusetts.

3. Defendant Liberty Mutual Insurance Company (hereinafter "Liberty Mutual") was and is a duly organized and existing corporation chartered under the law of the Commonwealth of Massachusetts with its principal place of business at Boston, Massachusetts.

4. At all times material, Liberty Life Assurance Company of Boston administered the benefits plan of Liberty Mutual.

1

5. At all times material, Liberty Mutual was self-insured.

6. This action is brought for recovery of benefits under the Employee Retirement Income Security Act, 29 USC §§ 1001 et seq.

7. Jurisdiction is conferred upon this Court by the Employee Retirement Income Security Act, 29 USC §§1001 et seq.

8. Plaintiff was hired by the defendant Liberty Mutual on or about September 16, 1964.

9. Sometime in May 1968, the complainant was promoted to sales representative and began working out of the Braintree office of Liberty Mutual.

10. Plaintiff worked for Liberty Mutual in this capacity for over thirty years.

11. Sometime in December 1997, plaintiff took a short term disability leave.

12. In June 1998, after his disability leave, plaintiff resumed his duties as an employee of defendant.

13. In September 1998, plaintiff took a second short term disability leave.

14. In January 1999, after his disability leave, plaintiff resumed his duties as an employee of defendant.

15. Sometime in December 2000, plaintiff met with his supervisor at Liberty Mutual and advised the supervisor of his disability and the opinion of his attending physician that plaintiff should request a third disability leave.

16. Knowing that the termination of plaintiff's employment was being processed, and with the knowledge that the disability of the plaintiff was materially and negatively impacting his job performance, the supervisor of the plaintiff persuaded the plaintiff to delay processing of his disability claim.

17. Based on the encouragement of the supervisor and the representation of said supervisor that the employer wanted the plaintiff to continue with his best efforts to perform his duties despite his disability, plaintiff delayed further action in advancing his claim for disability benefits.

18. On or about January 10, 2001, the plaintiff reiterated to said supervisor that his request for a disability leave should be processed because he was unable to function on the job due to his disability.

19. At the time of this request, the supervisor of the plaintiff knew plaintiff was disabled and was about to be terminated from his position and again represented to the plaintiff that his employer wanted him to delay processing of the claim and try for a further period to do his job notwithstanding his disability.

20. On or about January 11, 2001, defendant terminated the employment of plaintiff.

21. At the time of being notified of termination, plaintiff advised the Human Resource Representative of the employer and his immediate supervisor of his disability and requested a disability leave.

22. With the knowledge that plaintiff was in fact disabled, the Human Resource Representative advised plaintiff that he was not eligible for disability benefits because his employment had just been terminated.

23. Plaintiff believed that this representation was true and in reliance thereon, did not take any further immediate action to advance the claim for disability benefits which had been requested as set forth.

24. At all times up to and including the date of termination of employment, plaintiff was a qualified participant in the plan.

25. Plaintiff later pursued his administrative remedies and was subsequently advised that his claim was denied because it was not properly advanced prior to termination of employment.

26. To the extent that plaintiff may have failed to take any action required of him to advance his claim for disability benefits, such failure resulted from his disability and/or his reliance on the misrepresentations of his supervisor and/or the Human Resource Representative of his employer.

27. Plaintiff has exhausted his administrative remedies in seeking review of the denial of benefits.

### Count I
### Recovery of Benefits
### Pursuant to 29 USC §1132(a)(1)(B)
### ERISA

28. Plaintiff restates and realleges the allegations of all the preceding paragraphs, and by this reference, incorporates them herein.

29. At all times material, plaintiff was entitled to short term disability benefits.

3

30. Prior to his termination, plaintiff made a request for short term disability benefits.

31. The request for short term disability benefits was denied.

32. Said denial was in violation of the statutory and other rights of the plaintiff.

33. Said denial was appealed by the plaintiff and all administrative remedies have been exhausted by the plaintiff. See Exhibits A, B and C attached hereto.

34. Plaintiff has been damaged by said denial.

## Count II
### Failure to Provide Plan

35. Plaintiff restates and realleges the allegations of all the preceding paragraphs, and by this reference, incorporates them herein.

36. Pursuant to 29 USC §1022, plaintiff, through his attorney requested the summary plan for the benefits of plaintiff. See Exhibit D.

37. Defendant neglected, failed and refused to provide said plan. See Exhibit E.

38. Said conduct of the defendant was in violation of the provisions of federal law.

## Count III
### Breach of Contract

39. Plaintiff restates and realleges the allegations of all the preceding paragraphs, and by this reference, incorporates them herein.

40. The defendant was contractually obligated to provide short term disability and other benefits to the plaintiff pursuant to the terms of the defendant's short term disability plan and benefits plans.

41. Defendant breached said contract by denying benefits to the plaintiff.

42. Plaintiff was damaged by said denial.

## JURY DEMAND

Plaintiff claims a jury trial on all issues triable of right by a jury.

WHEREFORE, the plaintiff prays that this honorable Court enter judgment

in favor of the plaintiff awarding to the plaintiff equitable relief, damages, multiple

damages, interest, costs and attorneys fees, and grant such other relief as is

meet and just.

Respectfully submitted,
KEVIN W. TOBIN
By his attorney,

Dated: June /4 , 2005

Frank J. Frisoli, Esq.
BBO #180440
Frisoli & Frisoli
797 Cambridge Street
Cambridge, MA 02141
617-354-2220

5

# EXHIBIT A

 **Liberty Mutual.**

Liberty Life Assurance Company of Boston
Disability Claims
P.O. Box 1525
Dover, NH 03821-1525
Phone No.: (800) 210-0268
Secure Fax No.: (603) 743-6422

May 11, 2004

Kevin Tobin
P O Box 204
Humarock, MA 02047-0000

RE:    Policyholder: Liberty Mutual Insurance Co.
       Short Term Disability Benefits
       Claim #: 1206836

We have completed a thorough review of your eligibility for disability benefits.    Liberty
Mutual Insurance Co.'s Short Term Disability Plan states:

**Termination of Covered Person's Coverage**

A Covered Person will cease to be covered on the earliest of the following dates:

1.  the date this Plan terminates, but without prejudice to any claim originating prior to the
    time of termination;
2.  the date the Covered Person is no longer in an eligible class;
3.  the date the Covered Person's class is no longer included for coverage;
4.  the last day for which any required Employee contribution has been made;
5.  the date employment terminates.  Cessation of Active Employment will be deemed
    termination of employment, except the coverage will be continued for an Employee
    absent due to Disability during:
    a.  the Elimination Period; and
    b.  the period during which premium is being waived.
6.  the date the Covered Person ceases Active Employment due to a labor dispute,
    including any strike, work slowdown, or lockout.

Since your date of disability is January 11, 2001 and you were terminated in January 2001 we
are unable to approve your claim.  Liberty Mutual's STD Plan states the following:

You are expected to promptly report your claim to the Disability Claim Telephone Reporting
Service and are expected to cooperate in the review of your claim.  Benefits may be delayed if
your claim is not reported as soon as you think you are going to be out more than seven
consecutive calendar days.  Benefits may be forfeited if your claim is not reported within thirty
days from your initial date of disability.  If it is not reasonably possible for you or a family
member to file your claim within this 30-day period, you may still be eligible to receive
benefits provided your claim is reported as soon as possible from your initial date of disability.

However, unless delayed by your legal incapacity, your claim must be reported within 90 days after your initial date of disability or your benefits will be forfeited. You filed a claim over 2 years after your date of disability.

This claim determination reflects an evaluation of the claim facts and Plan provisions. We reserve the right to make a determination on any additional information that may be submitted.

Under the Employee Retirement Income Security Act of 1974 (ERISA), you may request a review of this denial by writing to:

The Liberty Life Assurance Company of Boston
Attn: Timothy Wright
Disability Claims
P.O. Box 1525
Dover, NH 03821-1525

The written request for review must be sent within 180 days of the receipt of this letter and state the reasons why you feel your claim should not have been denied. In your request for review, include documentation such as any and all office chart notes, therapy notes, test results, specific restrictions and limitations from all treating providers from December 2000 through the present which you feel will support your claim. You may request to review pertinent claim file documents upon which the denial of benefits was based. If Liberty Life does not receive your written request for review within 180 days of your receipt of this notice, our claim decision will be final, your file will remain closed, and no further review of your claim will be conducted. Under normal circumstances, you will be notified of the final decision within 45 days of the date that your request is received. If there are special circumstances requiring delay, you will be notified of the final decision no later than 90 days after your request for review is received.

Nothing in this letter should be construed as a waiver of any Liberty Mutual Insurance Co. rights and defenses under the above captioned Plan, and all of these rights and defenses are reserved to the Plan Sponsor, whether or not they are specifically mentioned herein.

If you have any questions about this determination please call me.

Sincerely,

Timothy J. Wright

Timothy Wright
Case Manager II
Phone No.: (800) 210-0268 Ext. 38390
Secure Fax No.: (603) 743-6422

Friscoli & Friscoli
Attorneys at Law
797 Cambridge Street
Cambridge MA 02141

# EXHIBIT B

# FRISOLI AND FRISOLI
## ATTORNEYS AT LAW

**797 CAMBRIDGE STREET**
**CAMBRIDGE, MASSACHUSETTS 02141**

**(617) 354-2220 Telephone**
**(617) 354-6939 Facsimile**

**FRANK J. FRISOLI, P.C.**
**LAWRENCE W. FRISOLI, P.C.**

**WENDY R. STANDER**

June 11, 2004

Liberty Life Assurance Company of Boston
Attention: Timothy Wright
Disability Claims
P.O. Box 1525
Dover, NH 03821-1525

Re:    Kevin W. Tobin, Claim No. 1206836

Dear Mr. Wright:

Please be advised that this office represents Mr. Kevin Tobin in regard to his claim for disability benefits referenced above. This correspondence is sent in response to your letter of May 11, 2004 denying benefits to my client. On behalf of my client I am forwarding this letter as notice and request for review. The authorization of my client is noted at the end of the letter.

I am enclosing with this correspondence the following documentation:

A.    Letter of William G. Kantar, M.D. dated February 4, 2001, together with his medical records as to treatment of Mr. Tobin from November 25, 2000 through January 26, 2001.

B.    A portion of the transcript of the continued deposition of Kevin W. Tobin taken on Thursday, June 5, 2003. I have included the portion of the transcript that deals with the events that are germane to my client's claim for disability and this appeal.

Timothy Wright
June 11, 2004
Page 2

C.    Copy of the diary notes and calendar of Manina Schwitters, the
      immediate supervisor of Mr. Tobin, reflecting discussions with Mr.
      Tobin on December 19, 2000 and January 2, 2001.

D.    Page from the transcript of the deposition of Kevin Vance of the
      Liberty Mutual Human Resource Department taken June 19,
      2003.

E.    Memorandum from Robert Nadeau, Regional Sales Manager, to
      Robert Maloney dated August 3, 2000.

My client's claim for disability was denied because his claim was
allegedly filed two years after the date of his disability. This is not, in
fact, the case since my client's claim was timely reported to management
and not processed due to management intervention. My client's
disability claim was first reported to Manina Schwitters at 1:00 p.m. on
December 19, 2000, at which time he advised his supervisor that his
physician had certified he was disabled and told him to file a disability
claim. Ms. Schwitters advised Mr. Tobin at that time that he should not
file a disability claim and should persevere in his efforts to try and do the
job. Her discussion with Mr. Tobin is confirmed by her calendar
notation, which reflects she was congratulating Mr. Tobin for his
performance at a time when his performance was admittedly
substandard due to his disability and termination of his employment was
probable. Mr. Tobin was clearly considered by Ms. Schwitters and her
supervisor, Robert Nadeau, as "high maintenance" and Mr. Nadeau had
been seeking authorization to discharge Mr. Tobin for several years as
reflected in his August 3, 2000 memorandum. The authorization to
proceed with the discharge process was granted following the August 3,
2000 and warning and probation followed. The Probationary period
extended to January 5, 2001. Mr. Tobin had previously been out on two
separate disability leaves monitored by Kevin Vance and Robert Nadeau
and had he filed for disability prior to January 5, 2001, Mr. Nadeau and
Mr. Vance would not have been able to terminate his employment.

Timothy Wright
June 11, 2004
Page 3

Ms. Schwitters had a subsequent conversation with Mr. Tobin on January 2, 2001 in which he advised her that he was stressed out, losing weight, had an inability to concentrate and that although he loved his job, he felt unable to properly perform it. In this discussion, he clearly indicated to Ms. Schwitters that his physician was again telling him to file a disability claim and that he wished to file as he was on probation at the time. He again inquired as to the possibility of a termination. Once again, Ms. Schwitters, with the knowledge that termination was probable, persuaded him not to file the claim, and encouraged him to persevere to continue to try and do the job. Her comments are confirmed by her own handwritten notes in her diary.

Mr. Tobin was subsequently terminated approximately three days later. He was called to the office by Ms. Schwitters and Mr. Vance and immediately informed he was terminated. He responded by advising he wished to file a disability claim. Mr. Vance responded by advising Mr. Tobin he had no right to file a claim because he had been terminated and was no longer an employee. That conversation is set forth in my client's deposition testimony which is supplied with this correspondence. Mr. Vance confirmed that discussion in his deposition testimony on June 19, 2003.

My client did notify both his supervisor and the Human Resource representative assigned to monitor his situation of his disability and specifically stated he wished to file a disability claim. My client had previously had two prior disability leaves during his tenure as a sales representative. At the time of my client's first disability leave, Mr. Vance was assigned to monitor his case. My client reported his disability initially to his supervisor, Manina Schwitters, who encourage him to continue on the job and dissuaded him from filing a claim at a time she clearly understood that his services were about to be terminated. At the time my client was notified of his termination in early January 2001, he attempted once again to file a disability claim and was told at that time by the Human Resource person assigned to monitor his situation that his claim was not timely and could not be pursued. In short, my client clearly did report this claim to his supervisor and then again to the Human Resource representative. Furthermore, knowledge of my client's

Timothy Wright
June 11, 2004
Page 4

wishes to file a disability claim were clearly conveyed to Mr. Vance by Ms. Schwitters immediately following her meeting with Mr. Tobin on January 2, as confirmed by her note that she spoke to Mr. Vance at 11:20 a.m. that day.

Although Mr. Tobin did not call the Liberty Mutual Disability Office in Dover, New Hampshire, the claim was initially reported to his supervisor, was subsequently communicated by that supervisor to the Human Resource Department at Liberty Mutual and prior to the time of his termination my client was dissuaded from proceeding with further action based upon representations by that supervisor that he would not be terminated and that he should persevere in his efforts to do the job despite his disability and inability to perform his job functions. My client has been an employee of Liberty Mutual for more than 35 years. He wanted to do the job to the extent that the company wished him to hang in there and continue to persevere, and he listened to his supervisor when she encouraged him to do this. At that time he was clearly disabled, as evidenced by the notes and records of Dr. Kanter, and his judgment was clearly impaired by this disability. In short, he was susceptible to influence by his supervisor and because of that influence, he did not proceed to call the Dover, New Hampshire Disability Office of Liberty Mutual after being told by his supervisor that his employer preferred that he attempt to do the job as best he can rather than file the disability claim to which he was entitled. At the time he was terminated both management and Human Resources of Liberty Mutual had clear knowledge that he was disabled and wished to file a disability claim, and Mr. Tobin was advised by Human Resources that he was not eligible to file the disability claim. Since this was the Human Resource Representative who had monitored his prior disability leaves, Mr. Tobin accepted the representations made by Mr. Vance and did not pursue the matter further at that time.

Mr. Tobin was clearly disabled at the time he was terminated. He clearly communicated that disability to both his supervisor and the Human Resources Department. He clearly communicated to both his supervisor and the Human Resources Department that he wished to file a disability claim. It was the direct intervention of Liberty Mutual Management and Human Resources that precluded the processing of

Timothy Wright
June 11, 2004
Page 5


his claim.   Accordingly, Mr. Tobin is clearly entitled to the disability
benefits and we request that the benefits be awarded him.

Very truly yours,

Frank J. Frisoli, Esq.


## Authorization


I, Kevin W. Tobin, hereby authorize Attorney Frank J. Frisoli to
represent me with respect to this appeal of the denial of my disability
benefits, and I certify that the statements and representations made in
this appeal letter are true, accurate and complete to the best of my
knowledge and belief.

Kevin W. Tobin

Dated:  June 11, 2004

EXHIBIT A

**William G. Kantar, M.D.**
**382 Kenrick Street**
**Newton, MA 02458**
Tel: 617-969-9084
Fax: 617-965-4821

February 4, 2001

To Whom It May Concern:

Re: Mr. Kevin Tobin
     Soc. Sec. #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

Mr. Kevin Tobin has been under my care since 1976. For many years, he carried a diagnosis of generalized anxiety disorder. In 1995, he began to experience a number of hyperenergic episodes, consistent with mania. The diagnosis of bi-polar manic was made. Since that time, he has had several more manic periods, as well as some minor depressive periods. However, in October 2000, he began to exhibit more profound depressive symptomatology, which has continued to the present. The symptomatology is manifest by great difficulty in motivating himself, confusion, lack of ability to concentrate, poor sleep, and near total loss of appetite, with a 16-20lb. weight loss that continues. He sustains himself by forcing himself to eat something each day. His hygeine has not deteriorated.

External stresses continue to plague him. He is now divorced. His children, whom he loves dearly, are bitter about the divorce, and seem to be influenced by their mother, to believe that he is mean and unfeeling. His ex-wife, who had cancer in one breast several years ago, has developed cancer in the other breast. While divorced, Mr. Tobin continues to be concerned about his ex-wife's health, and also about the welfare of his children. He is devastated by his children's rejection of him, and chagrined by his ex-wife's illness.

Work has become more demanding and complex. He has felt slighted, unsupported, and overwhelmed by it for the most part. From the way he describes the situation, I infer that the business administration side of his employment is unsupportive, and the personnel side tries to be helpful to him. His depression is fed by these stresses. It also renders him less able to cope, making the situation at work especially difficult for him. In other words, the complexities of the work situation are in themselves, a challenge for him. His depressed symptomatology makes the difficult even more difficult, and in my opinion, exceeds his capacity to manage.

Since late November 2000, it has been my opinion that he has been too ill to function at work. He has not been suicidal, nor has his depression reached psychotic proportions, so

CONFIDENTIAL
TM 00253

To Whom It May Concern:                                      Pg.2
Re: Kevin Tobin
    Soc. Sec. #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

that commitment has not been an option for me. Consequently, it has been his decision to
try to work, despite his very compromised mental state. He defends his decision to
continue trying to work by his assessment of his work situation, based upon meetings
with the personnel department at Liberty Mutual, which he feels has encouraged him to
continue. He believed, from his understanding of the personnel management's message,
that the company would continue to support him in his job.

I have treated him with Celexa, an anti-depressant, and with Klonapin, an anti-anxiety
medication, and with a psychostimulant. These medications have not been sufficient to
overcome his depression. I believe that he has been disabled by his illness, at least since
the beginning of December 2000. I believe that his ability to understand whether the
company was supportive of him or not was compromised by his illness. He does not
have the ability to make a sound judgment. From my observations of him throughout the
month of December 2000, I believe he was and is too sick to carry out the responsibilities
of his job.

Sincerely yours,


William G. Kantar, M.D.

CONFIDENTIAL
TM 00254

Tobin        11/25/00

He's quite depressed now. He rambles on about AA. It's kind of unproductive talk. He's not an alcoholic. He has had occasional beers. He may have had an occasion here and there when he had one beer too many, and wasn't always using the right social judgment for his wife, or in the family setting. However, he's never been outright drunk. He has had no DWI's. He's never missed work. There are no withdrawal symptoms ever, no heavy drinking, no binge drinking. So he just isn't an alcoholic. He is nervous. He does get upset. He gets mixed up. Work if very difficult for him. He is not seeing his daughter. Money is now a problem, and it is compounded by the fact that the Libery Mutual Company keeps changing the basis of their contracts, so that it is harder and harder to get a bonus, or even get what he used to get. It is dismal, and there is nothing much he can do with it. The new computer system is hard for him to cope with. I think a large part of that is his mental state, but it also appears that they may not have provided training, and they don't have support staff for him. He certainly makes a case that he is being discriminated against, and it is a vicious circle: as that happens, he becomes more despondent and concerned that he won't be able to meet their demands, and in turn, that makes him less effective, so that it is less likely that he will meet their goals or criteria. So we talked some about this, although he is not really able to process it in a meaningful way. He is too concerned with all this, and he ventilated a great deal. We are going to start some Celexa to see if that might help, and we will meet next week.

CONFIDENTIAL
TM 00250

Tobin          12/2/00

He's really quite depressed, although his daughter did thank him for her birthday present and card, which was a relief. He is really getting more confused, less able to mobilize himself, and do what needs to be done, even if it takes longer. More confused about what is the problem, whether it is himself, or his work, what he wants, what he should do. So the progression of his dysfunctionlity…we'll meet next week.

CONFIDENTIAL
TM 00249

Tobin          12/9/00

His depression has progressed. He is quite anhedonic. He has lost quite a bit of weight. He is having a lot of trouble eating. He has no appetite whatsoever, and forces himself to have a hamburger during the day, or a bagel and cream cheese, but eating minimally. We talked about his condition, and I think the external events, the difficult with work, and the difficulty in making any sense of his ex-wife go on. But whether he can do the work is also a big concern, and he just isn't able to keep up. I think he is just too anhedonic at this moment. I'll meet with him next week.

CONFIDENTIAL
TM 00248

Tobin          12/12/00

This was a telephone conversation. Betty Ann may have something in her other breast. She is going for examination. We talked a little about how stressful and difficult it will be if she has more cancer. But he can't control things. He has to see how they unfold, and try to respond in as helpful way as possible.

CONFIDENTIAL
TM 00247

Tobin        12/22/00

He is really quite depressed.  He has lost 15-16 pounds, has no appetite, has trouble
sleeping, has anhedonia.  He is not suicidal, but he is really confused, can't focus, and
can't motivate himself to accomplish things.  His wife, his ex-wife actually, has had
another biopsy, but the results of it are not known to him.  Work is very difficult, a lot of
pressure.  He finds himself overwhelmed by that.  He is taking Celexa.  He is taking
Ritalin, some, and he takes some Klonapin during the day.  We talked about it.  He is
safe.  We will meet next week.

CONFIDENTIAL
TM 00246

Tobin          12/29/00

He is really quite psychomotor retarded.  He finds he has no energy, and he cannot push himself to do things.  He would like to go to the gym – he can't get himself to do it.  He gets up and then he won't leave the house.  He is not going to New Beginnings.  He is really frozen.  In addition, his appetite is nil.  He forces himself to eat something.  His sleep is disturbed.  He is thinking clearly, and recognizes that he can't do anything.  He seems to want to fight against it, and try, and he complains that he just can't move.  Work, his wife – there's no news about whether she has a recurrence of cancer.  The distance from his daughters, financial issues – all contribute, and we talked about it.  I've increased his Celexa from 20 to 40mg./day.  He takes some Klonapin, and some Ritalin.  We tried tricks like staying up all night – it hasn't been effective.  So we'll see where he goes.  We're going to stay in touch early next week, and meet next week.

CONFIDENTIAL
TM 00245

Tobin          1/06/01

He continues to lose weight. He doesn't look well. His affect is flat. There is some psychomotor retardation. He is having trouble getting up in the morning. He is having trouble applying himself, focussing and concentrating. He's beside himself that he's dysfunctional, because he needs to function more. He feels the company has been trying to help him, but on the other hand, they can't give him mass merchandising until he meets his quota, so there's a catch 22. He doesn't know what to do. He is becoming more and more dysfunctional. Whether he will be able to go to work next week, is a real question mark in my mind. If he can't, he can't. But he is really caught in the depressed cycle of this illness.

CONFIDENTIAL
TM 00244

Kevin Tobin          1/12/01

He was fired on Wednesday. Whether he can move to disability isn't clear. He sort of realizes that he misjudged things. He continues to lose weight. Bettyann is positive for cancer in the other breast. She had four lymph nodes positive when she had the first. So she is in a tizzy. We talked about that. I suggested that he had to stand up to her and say it is important that they cooperate, but that it can't be simply on her terms. I also suggested that he ask Frank for somebody to help them think about how to manage their finances, and how to go about doing things, and that they both participate in this. If she is willing to do this, as opposed to running the show herself. He is very upset. He is obviously depressed. Now, on top of the other anxieties, he is guilt ridden about himself. So we'll see what takes place.

CONFIDENTIAL
TM 00241

Tobin          1/26/01

He continues to have no appetite. His sleep is upset. He is very worried about what is
going to happen. He perseverates on the faults of his wife, his job. He always has these
logical responses that would take care of it, but he continues to lack focus, inability to put
anything in perspective, his concentration is off. But he is safe, and not suicidal, and that
is not a problem. We will meet next week.

CONFIDENTIAL
TM 00240

Thursday June 5, 2003
Transcript of continued deposition of Kevin Tobin 726

```
 1                    (Document marked as Exhibit 32 for
 2        identification.)
 3             Q    (BY MR. FRISOLI)   Now, Mr. Tobin, you
 4        were present a couple days ago when this particular
 5        document was discussed with Ms. Schwitters at a
 6        deposition?
 7             A    Yes, on Tuesday.
 8             Q    Do you agree that you did meet with her
 9        on or about January 2 of 2001?
10             A    Correct.
11             Q    And Ms. Schwitters also had a notation in
12        a diary that she met with you on December 19 --
13             A    Right.
14             Q    -- 2000?
15             A    Correct.
16             Q    Did you have a meeting with her on that
17        date?
18             A    Yes, I did.
19             Q    Now, let's first deal with the December
20        19 meeting.
21             A    Correct.
22             Q    What happened at this December 19
23        meeting?
24             A    Well, I was getting very, very nervous,
```

EXHIBIT B

1    because the people I was calling were all putting
2    me off because of the holiday venue.  I only had
3    about nine policies.  I sold seven.  And she did
4    put congratulations, but I only had nine.
5            And I held up a piece of paper that
6    we have on file, and I just highlighted the word,
7    may be terminated.  And my words were, Nina, you
8    got to help me with this question.  This says, may
9    be terminated.
10           And I remember what I said.  I have
11   to do what's best for me.  I'm going to go out on a
12   disability.  It doesn't look like I'm going to make
13   my quota.
14           And her response was, Kevin, to me,
15   you look like you're doing well.  You have a
16   sortograph on the left for new business.  You have
17   a sortograph on the right for correspondence.  And
18   in fact, you're doing much better on the CAW
19   system.  I have a few salesmen that aren't even
20   doing as well as you.  Hang in there.
21      Q    At this point in time, was Linda Bedard
22   assisting you?
23      A    No.  She was training, because as I said,
24   at least the 15th -- may have been the 10th -- but

```
 1    she -- Linda Bedard was training Larry and Darren.
 2         Q    And at this point in time, had you had
 3    any visits with Doctor Kantar?
 4         A    Well, he's the one that advised me to go
 5    out on disability before I met.  And the issue with
 6    him, I stated, if I get any negative feedback from
 7    Nina, then I'm going to take your advice and go out
 8    on disability.
 9         Q    Did you get any negative feedback?
10         A    No.  I got positive.
11              If I got one inch of negative
12    feedback, one inch, I would have just said, my
13    doctor has advised me to go out on disability.
14              And I did expand on, you know, my
15    condition, I'm not focused, et cetera.  She knew
16    all of that.
17         Q    Now, looking at this document that we
18    have marked as Exhibit 32 --
19         A    37.
20         Q    Well, it's marked -- we've marked that as
21    Exhibit 32.
22         A    Okay.
23         Q    And that's a document that's been marked
24    at Ms. Schwitters' deposition as Exhibit 4.
```

```
 1        A    Right.

 2        Q    All right.  So we're looking at the same

 3   document.

 4        A    All right.

 5        Q    Okay.  If you look at the first -- top

 6   third of the page, there's a three and a one, week

 7   52 --

 8        A    Right.

 9        Q    -- activity.  And then there's some

10   dates, three quotes, and one, one, one.  You see

11   some dates there and some numbers?

12        A    Right.

13        Q    Do those notations have any relation to

14   the discussions that you had with Ms. Schwitters?

15        A    Right.  It's the reason that I'm talking

16   to her.  I got three, two -- I got 10 -- 10

17   policies, per her notes.  I thought I only had

18   nine.

19        Q    Okay.  And then there's a comment further

20   down, not on level playing field?

21        A    Right.  That's -- that's my discussion

22   with her.  You know, how do you expect me to do

23   this?  I'm not on a level playing field.  You've

24   got Linda Bedard training two assistants.  I need
```

730

```
1    help.
2         Q    What does it says, firemen, five dogs?
3    Would that have been anything that came up in your
4    conversation?
5         A    What it is, I was working with the
6    firefighters.  And she referred to them as dogs,
7    meaning -- but she didn't refer to them at the
8    meeting.  This is her notation.  And in her
9    testimony, she would say that she might write a
10   note, you know, on this sheet on a different day.
11        Q    And then down a couple lines, it says, no
12   excuses, stressed, work, work, work?
13        A    Right.
14        Q    Did you have any discussions with her
15   relative to any of those terms?
16        A    Yeah.  I told her, you know, I'm stressed
17   to the limit.  I'm working late.  I don't sleep.  I
18   don't eat.  All I do is work.  You know, I'm doing
19   the best I can.  And I don't mind the extra work.
20   And that's where the level playing field come in.
21        Q    Mr. Tobin, the next line under that says,
22   eight to 10 possible?
23        A    Right.
24        Q    Do you see that?
```

731

```
 1        A    Right.
 2        Q    Does that have any significance relative
 3   to your discussions with her?
 4        A    Yeah.  Basically she said, you know, that
 5   we're halfway through the period, and you got eight
 6   to 10 policies.
 7        Q    Well, Mr. Tobin, how many policies --
 8   this note is dated January 2 of '01?
 9        A    Right.
10        Q    Your probation period ended in three
11   days; is that correct?
12        A    Right.
13        Q    As of this period of time, how many
14   policies had you sold?
15        A    10, as it says here.
16        Q    How many policies were you required to
17   sell?
18        A    24.
19        Q    Did you have any expectation that you
20   would be able to meet the terms of the probation
21   and sell enough policies as of January 2, '01?
22        A    Even on the 19th, I knew I couldn't do
23   it.  But in the conversation --
24        Q    One thing.
```

732

1      A    Yeah.

2      Q    You said, "by the 19th."  What day are

3  you referencing?

4      A    December 19 of 2000.

5      Q    On that date, did you have an expectation

6  that you would be able to meet the terms of your

7  probation?

8      A    No.  I discussed the fact that because of

9  the holidays, people were putting me off.

10     Q    On January 2, '01, did you express to

11  Nina that you thought you would be able to sell

12  enough policies to meet the terms of your

13  probation?

14     A    No.  In our prior discussion on the 19th,

15  when she told me that I was doing well, she really

16  said, everybody was kind of set back somewhat,

17  learning CAW, and CAW was Liberty Mutual's wave of

18  the future, and encouraged me to stay.

19     Q    Now, the next line says, 37 years.  Does

20  that have any significance?

21     A    Yeah.  Just that I was hired in nine of

22  '64.  And actually, I think I figured out, I had

23  36.3 years with Liberty Mutual.

24     Q    What about this notation, one more

733

1    chance?  Did that come up in the discussion?

2        A    Yeah.  I just said, you know, I go from

3    warning to probation.  It's like working under --

4    it's working like a gun in your face.  Just, you

5    know, if you just give me like six months, you

6    know, let me work.  Let me get in mass

7    merchandising.  Just give me an opportunity to

8    prove myself.

9        Q    And now go to the next line.  It says,

10   success before.

11            Does that have any significance?

12       A    Maybe -- I think she's relating to I was

13   successful in the past, but also, she could be

14   relating to the fact that I've made a couple of --

15            MR. CHINITZ:  Objection.

16       A    -- warning periods.

17       Q    (BY MR. FRISOLI)  Well, what I'm asking

18   you is, do you recall discussing with Nina anything

19   about any prior success?

20       A    Yeah.  I mean, I told her that, you know,

21   I was a competent salesman and, you know, for

22   years, the only thing that they wanted a little

23   more out of me was life insurance, that I didn't

24   have any problem with casualty insurance.

734

1    Q    At the bottom, on the next line, it says,
2    3,000 accounts.  Is that what it reads?
3    A    Right.  Yeah.
4    Q    What would 3,000 accounts be?
5    A    That's how many accounts I had.
6    Q    Now, the next lines down, it says,
7    question.  Then it says, stressed.  Then there's a
8    circle, there are options.
9         Do you see that?
10   A    Right.
11   Q    Did you have any discussions with Nina
12   Schwitters at this meeting on January 2 at which
13   other options were discussed?
14        Let me skip down two more lines.
15        Do you see where it says, retire?
16   A    Yeah, retire.  Go ahead.
17   Q    And what does it say after that?  Doesn't
18   want to?
19   A    Right.
20   Q    Did the issue of your retirement come up?
21   A    No, not -- she did not talk to me about
22   retirement.  I talked about just, you know, getting
23   more time, you know, are there any other options.
24   Q    So that -- the notation about retirement

```
 1     is not referring to anything that was said at the
 2     meeting?
 3          A    No.
 4          Q    Okay.  And see where it says, time off,
 5     physical and mental?
 6          A    Yeah.
 7          Q    Did you have discussions about that with
 8     her?
 9          A    On the 19th, I told her I wasn't eating
10     and sleeping and, you know, the stress was
11     overwhelming.  That's all.  And she knew about it.
12          Q    Did you have any discussions with
13     Ms. Schwitters -- well, let's look down a few more
14     lines.
15               It says, Kevin fell behind, not in
16     tune.
17               MR. CHINITZ:  Objection.
18          Q    (BY MR. FRISOLI)  Is that anything you
19     discussed with her?
20          A    I think it's a notation that she
21     realized -- I mean, the only analogy I can give is,
22     if a piano is not in tune, it's not functionable,
23     you know what I mean?
24               And with the stress level and no
```

736

```
1    help, that's the only thing that I can summarize
2    out of her notes here.
3         Q    Now, on the next page, it says,
4    termination, with a question mark.
5              Did Nina Schwitters discuss with you
6    the possibility that you would be terminated?
7         A    Never.
8         Q    Did you discuss with her at this time,
9    again, the issue of going out on disability leave?
10        A    I did, yeah.
11        Q    And what did she say to you?
12        A    She said to me, you know, I had a lot of
13   longevity, to the best of my knowledge, and that I
14   was doing better.  That's all.  But, you know, hang
15   in there is the word.
16        Q    Okay.  Now, did you have any discussions
17   with Kevin Vance between December 1 of 2000 and the
18   time you saw -- and when he terminated you on
19   January 10 of '01?
20        A    No.  Kevin Vance's deposition, he said he
21   met with me.  But again, there's no e-mail.  And
22   for someone to drive from Auburn, Massachusetts to
23   Hingham, Massachusetts without sending an e-mail
24   for confirming an appointment ...
```

737

```
 1        Q     Did he call you up in that period of
 2   time?
 3        A     No, not to my recollection, no.
 4        Q     Did Kevin Vance ever tell you, in that
 5   period of time, that if you didn't meet the terms
 6   of the probation, you were going to be terminated?
 7        A     No.   And they always put the word in "may
 8   be."   If they put the word in "terminated," you
 9   will be terminated, I had -- that's why I held up
10   the letter and highlighted the word may be.
11               I was under a disability, and they
12   really took advantage of me.
13               If that may be wasn't in there, we
14   wouldn't be here.
15        Q     Now, Mr. Tobin, do you believe that
16   Liberty Mutual has discriminated against you
17   because of your age?
18        A     Yes.   I think that --
19               MR. CHINITZ:   That's a yes or no
20   question.
21        A     Yes.
22        Q     (BY MR. FRISOLI)   Why do you believe
23   that?
24        A     Because I think the veteran salesmen are
```

738

```
 1   very costly.  And with mass merchandising, they
 2   don't need as many sophisticated, knowledgeable
 3   people.
 4        Q    Do you believe that Liberty Mutual has
 5   discriminated against any other salespersons in the
 6   northeast region because of their age?
 7             MR. CHINITZ:  Objection.
 8        A    I believe so, because why were they
 9   giving the lion's share of mass merchandising just
10   to a few and not distributing it evenly so that
11   everybody could make their quota?
12        Q    (BY MR. FRISOLI)  Do you believe that
13   Liberty Mutual took any action against you because
14   you exercised your right to have an attorney?
15        A    I think that in their eyes, that I broke
16   rank.  And I think they did take action against me
17   for two reasons, that I got counsel, and I had a
18   disability, and they could take advantage of me.
19        Q    Do you believe that the fact you got an
20   attorney influenced Liberty Mutual's decision to
21   terminate you?
22             MR. CHINITZ:  Objection.
23        A    Yes, I do.
24        Q    (BY MR. FRISOLI)  And in what way did it
```

739

```
 1    influence that decision?  Did it influence them to
 2    fire you, or did it make it less likely they would
 3    fire you?
 4              MR. CHINITZ:  Objection, leading some
 5    more.
 6         A    It enhanced their willingness to fire
 7    me.  It enhanced them wanting to terminate me.
 8         Q    (BY MR. FRISOLI)  Mr. Tobin, we've been
 9    over this.  You've testified that you asked Liberty
10    to give you some additional assistance because of
11    your disability; is that correct?
12         A    Right.
13         Q    Do you believe that these requests for
14    additional assistance in any way influenced Liberty
15    Mutual's decision to fire you?
16              MR. CHINITZ:  Objection.
17         A    Would you ask that one more time?
18         Q    (BY MR. FRISOLI)  Did your request for
19    mass merchandising programs or administrative
20    assistance influence Liberty Mutual's decision to
21    fire you?
22              MR. CHINITZ:  Objection.
23         A    I think it's the way they got to fire
24    me.  And it did influence them in firing, because I
```

740

```
 1   kept asking.  And maybe I was a pain, because every
 2   time I saw them, I kept asking.
 3        Q    (BY MR. FRISOLI)  Now, do you believe
 4   that Liberty Mutual wrongfully discharged you?
 5             MR. CHINITZ:  Objection.
 6        A    At the time of the termination, I was
 7   unaware; but now that we've gone through
 8   depositions, and I've seen all the documentations
 9   and the written statements, Kevin heavily
10   medicated, by Nina and by Kevin Vance and Mike
11   Robin, they all knew I had a disability, and they
12   really did not want to help me, or were not allowed
13   to help me.
14             And very easy to get -- it's like a
15   wounded animal -- it's like very easy to get rid of
16   a person who has a disability.  You can take
17   advantage of a person with a disability.
18        Q    (BY MR. FRISOLI)  Did Liberty Mutual take
19   advantage of you?
20             MR. CHINITZ:  Objection.
21        A    They did to the utmost.
22             MR. FRISOLI:  Just give me a minute,
23   Counsel.  I think we're just about done here.
24             MR. CHINITZ:  Sure.
```

741

```
 1                THE WITNESS:  Two minutes to go down
 2   the hall?
 3                MR. FRISOLI:  Sure.
 4                Is that all right?
 5                MR. CHINITZ:  What?
 6                MR. FRISOLI:  He wants -- off the
 7   record.
 8                MR. CHINITZ:  Sure.
 9                (Recess taken 2:47 to 2:50 p.m.)
10       Q    (BY MR. FRISOLI)  Mr. Tobin, let me just
11   draw your attention to the events of January 10,
12   2001.
13       A    Right.
14       Q    That date has some significance to you?
15       A    That's the date I was terminated.
16       Q    That morning, were you -- did you go
17   directly to the office?
18       A    No, I did not.  I was on a call,
19   homeowners call.
20       Q    And at some point, were you summoned to
21   the office?
22       A    I got a call by Ed Mace, who was doing me
23   a favor, he thought.  And he said to me, geez, we
24   got Kevin Vance and Nina looking for you.
```

742

```
1        Q    So what did you do?
2        A    I said that I didn't want to get
3   involved.
4        Q    What did you do?
5        A    Well, I immediately went to the office
6   after my homeowner call.
7        Q    And when you went to the office, did you
8   meet with Mr. Vance?
9        A    Yes, I did.
10       Q    And who else was present at the meeting?
11       A    Nina was there.
12       Q    Ms. Schwitters?
13       A    Yes.
14       Q    Who else?
15       A    At Kevin's deposition, that's all he
16  said; but there was an armed guard at the front
17  desk -- I assume armed.  I can't say he was armed.
18       Q    Was he wearing a uniform?
19       A    No.  He was in civilian clothes.  But I
20  didn't know him, never seen him.
21            Nobody gets through our security
22  system.
23       Q    And what happened -- you said you
24  appeared at the site?
```

743

```
 1        A    Right.
 2        Q    Did you meet with Vance and Schwitters?
 3        A    Yes, I did.
 4        Q    Where were you physically when this
 5   occurred?
 6        A    I walked in, put down my briefcase.  And
 7   either Nina or Kevin, I can't remember which, just
 8   said, can you come into the conference room.
 9        Q    You went into a conference room?
10        A    Yes.
11        Q    What's the next thing that happened?
12        A    As I walked through the threshold, they
13   closed the door.  And Kevin Vance said, you're
14   terminated.
15        Q    What did you say?
16        A    Well, Kev, why don't I just go out on
17   disability?
18             And he said, you're not eligible for
19   disability.
20             And I said, how could that be?  I
21   paid like $669 a year for a benefit, and you're
22   telling me that I'm not eligible for it?
23        Q    What did Mr. Vance say?
24        A    Only eligible for employees.  You're not
```

1    an employee anymore.

2        Q    Was there any time lag between you saying

3    this to Vance and Vance saying to you, you're

4    terminated?

5        A    About three seconds.

6        Q    Okay. Well, and after that immediate

7    discussion, was there any further discussions?

8        A    The meeting, contrary to Kevin's

9    testimony in his deposition, was very brief, for

10    the fact that they wanted me out of that office

11    ASAP.

12            He handed me an envelope saying I was

13    terminated.

14            He did not know his job, because he

15    referred to that I would have to go on the COBRA

16    program.

17            I had a wife with breast cancer,

18    which was very, very devastating. He did not know

19    the differential. To be fully invested in the

20    retirement fund, it's 35 years, but to be invested

21    in the medical, it's 55 and 30 years.

22            He was essentially either calling me

23    the next day, or a day -- either one or two days

24    later, to say that he was wrong, that I was

745

```
1    eligible for the retirement benefits.
2              But my meeting with Nina and Kevin
3    didn't last more than 10 minutes.
4        Q    What happened after the meeting?
5        A    They asked me to go out and clear my desk
6    off as quickly as possible, and to exit the
7    building.
8        Q    Did anybody accompany you while you did
9    this?
10       A    No.  Actually, the security fellow stayed
11   in the same position.
12       Q    How long did it take you from -- if you
13   said that meeting took 10 minutes, how much longer
14   was it until you were out of the building?
15       A    Just another 10 minutes.  Just -- they
16   had boxes.  They just threw everything in the
17   boxes, indiscriminately.
18              I wanted -- I was embarrassed.  I was
19   devastated.  I couldn't think.
20              I'm saying, I got no insurance.  I'm
21   terminated.  After 37 -- I couldn't think
22   straight.
23              So I just threw as much paraphernalia
24   as I could in the boxes, in any which way, and
```

Dar I of Exh 19

# 19

**Tuesday**
**December 2000**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 31 | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

**November 2000**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

**January 2001**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

✓ Task Completed
→ Planned Forward
✕ Task Deleted
G⊘ Delegated Task
• In Process

↓ ABC    **Prioritized Daily Task List**

ⓘ comment not computer
Savy - needs a course -

Suggested focus on writing
Business.

# total ⑨

need to sell - working
Sat + Sun
he did not understand
why he's not writing -
prospecting - referrals etc.

**Daily Expenses**

Shelt - reviewed (needs activity)

**Appointment Schedule**

**7**

**8**

**9**  gdk? Herb - leave @ 11?

**10**

**11**  left meeting - make a call

**12**

**①**  15 minutes
Kevin Tobin
① congratulating

**2**

**3**

**4**

**5**

**6**

**7**

**8**

© 1998 Franklin Covey Co.    www.franklincovey.com    Original-Monarch

**CONFIDENTIAL**
LM 02489

SCHWITZERS

EXHIBIT NO. 4
11/7/02
N. MALOOF

Kevin Tobin                                                    1/2/2001

          3
          1          week 52
          =

     Activity· yes.                              Positive

Date:
10/25 — 3 quotes

 1/1    —    1

12/3    —    1

11/15       1   —   H/O

11/30       1


No   mm → (12)
          accts
Not on level playing field —    Fireman — 5 Dogs.

Competitive — not competitive

No excuses — Stressed — work + worry

# 8-10 possible —    do not think

            , one more chance
37 years — needs: help (?)  What — Computer like Fed
           other issues                                  ask ↗
Success — before —   Recommendations — big
      X cards + reco —       # 3,000 accounts —   .
                         (are these !
Question — Stressed →? options ? time-off — physical &
                                                mental
                         — make a decision
                         — retire — doesn't want to
                                                do —
Kevin - fell behind — not in tune —
                                            (learning
Stressed out: losing weight - concentration  micro -
       not that: love the job —              technical -
32 years                                     life stuff.
      Time-off — on his own — Calput - Typing + computer skills

9/6+

Original-MO 17394

**CONFIDENTIAL**
LM 02461

Termination - (?) Health wise — need skills —

(A+) Personality - calling people, quotas. & Talent - I have.

#

other thing

Kevin Vance - called 11:20

CONFIDENTIAL
LM 02462

©1997 Franklin Covey Co. Printed in USA    Original-MO 17394

100

EXHIBIT D

```
 1              termination discussion?

 2      A    I'm not sure what some of these notes mean, Frank.

 3            Some of these things I think were probably said

 4            during the termination meeting.  But I don't

 5            understand what some of her notes are.  I can't --

 6      Q    Was there any discussion by Mr. Tobin of early

 7            retirement.

 8      A    After he had been notified that he was terminated

 9            he asked if he could take early retirement.

10      Q    Was there any discussion by Mr. Tobin of his

11            disability or handicap?

12      A    After the termination discussion, he asked if he

13            could file a disability claim.

14      Q    Was there any discussion by Mr. Tobin that -- to

15            the effect that he had been handicapped in trying

16            to do the job?

17      A    I don't recall specifically what was said.  I know

18            that there was a mention that I think I should go

19            out on disability, maybe I should have gone out on

20            disability.

21      Q    Was there any discussion by Mr. Tobin to the effect

22            that some handicap impaired his ability to do the

23            job?

24      A    I think what he said to me and what I said to you
```

## Maloney, Robert

| | |
|---|---|
| **From:** | Nadeau, Robert |
| **Sent:** | Thursday, August 03, 2000 10:27 AM |
| **To:** | Maloney, Robert |
| **Cc:** | Vance, Kevin; Schwitters, Manina |
| **Subject:** | FW: Kevin Tobin- meeting on August 1 |

**Importance:** High


Schwitters
EXHIBIT NO. 13
6/3/03
N. MALOOF

Hi Rob,

Kevin and I figure we've lost well over 300 man hours trying to help Kevin improve his performance, however it has not improved. Also he is a high maintenance rep for the employees in the Hingham office, and for his manager Nina. He continually has problems with meeting dates for training sessions ( ie CAW) , quarterly planners, etc. She had to spend over 2 hours with him this week trying to help him organize again this week. Meanwhile, that's 2 hours we lost training brand new reps who haven't been trained on procedures and products once, let alone over and over like Kevin has.

Today you'll be faxed four recent documents from Kevin's file. His file is extremely thick loaded with years of documented poor performance, several written warnings, probation periods, and poor behavior. Here's a snapshot of the 4 documents:

**1. May 10,1999 memo** This apparent final warning clearly states he needed to sell 276 policies by the end of the year, and average 78 polices per 13 week quarter which works out to a 6 per cap, the min. standard in Mass. He came in at 229 polices on the December IBM a full 47 policies short. Completely un-acceptable, not even close. Yet nothing happened.

**2. 2000 marketing Plan** Done on January 11, this is completely his plan. It's not surprising to note he hasn't done the activities he said he would, nor has he come close to getting the results he said he would. Through June Kevin is 47 policies short of his plan.

**3. March 2000 Quarterly Planner** The first QP this year shows an un-acceptable result. The March IBM shows 47 polices versus the 78 he was required to have as of the May 10 final warning. (That number 47 keeps popping up?)

**4. June 2000 Quarterly Planner** The second QP of the year shows 44 policies (organizer) clearly an un-acceptable result again as outlined in Nina's August 1 meeting with Kevin.

In the past, we have not been supported in taking any action what-so-ever with Kevin. For example, a senior vp in home office had the regional sales mgr take Kevin completely off probation in 1996. Kevin's sales results were the worst in the command, and un-acceptable, however senior mgt took him off probation. Also I wasn't even supported on trying to suspend Kevin for one week after he blew-off a scheduled meeting with his manager in the fall of 1997. This was 5 days after he received a strongly worded written warning. (The 1.5 page letter with 35 revisions by Laura Williford) That warning clearly stated there would be consequences for missing another meeting. He got that letter after missing so many meetings with his manager. He had complete disregard for mgt. He had even directed obscenities at me. These are just some examples.

That brings us to today. What can we do? We've tried everything from encouragement, selling ideas, re-training using tools like the success guide, even the companies progressive discipline process. Literally nothing has worked. Field mgt and I feel uncomfortable trying to do anything. So we just try our best, and keep the quarterly planners documenting his poor results which are clearly communicated to Kevin on an on-going basis. Quarter after quarter, year after year.

We've tried weekly meetings, however they didn't really help because he doesn't apply what he's been taught. He also frequently skipped out on weekly meetings. That high maintenance approach places a severe strain on a manager who has so many other pressing responsibilities.

But here's the no win situation. We can not make our quotas with low producers like Kevin. I didn't get my usual high appraisal rating last year because I missed my quotas. Keeping a poor producer like Kevin sends a loud message to the field. You don't have to work hard, or follow mgt direction and nothing happens. It makes the sales mgrs job even harder when they have to try to motivate or push other reps.

At least 70% of our sales force are the middle performers. Everyday they look at their peer group, and are either pulled up by our top performers (15% of reps) or pulled down by low producers (10% of reps). I've heard reps say: "Why should I work so hard, I see this guy work a lot less, sell a lot less and make about the same money." Face it, you are what you see and hear. In these times of trying to raise our per-capitas, we hand-cuff managers with high quotas, yet don't support them with the progressive discipline process. It's a no win situation for managers.

Would you visit Kevin Tobin and get his perspective, then talk to Jim Masterson and our HR reps. Before Nina or I even think of doing anything with our progressive discipline process for Kevin's un-acceptable results, we need strong assurances we'll supported this time. Technically, he hasn't met his numbers, and has been on warning and probation

1

LM 02453

several times. You're only supposed to be on probation once, he's clearly used up his chances cver and over. Personally, I'd like to see Liberty work out some sort of a package for him.

Bob


-----Original Message-----
**From:** Schwitters, Manina
**Sent:** Thursday, August 03, 2000 8:24 AM
**To:** Nadeau, Robert; Vance, Kevin
**Subject:** Kevin Tobin- meeting on August 1
**Importance:** High

I have several concerns about my meeting with Kevin Tobin on August 1 in Hingham. My visit was a routine review of quarterly planners with the sales reps.

1. Kevin appeared heavy medicated and unable to focus on our discussion. He arrived in the office around 10:30, he just visited the doctor office and it took longer than he expected.

2. Before Kevin Tobin was in the office, I had a discussion with Laura Ashworth who was concerned about his messy desk. On the previous Friday they were trying to find a homeowner binder and were unable to help the customer because there was no record of information on his desk. Laura was also concerned about his notes and clutter in the workstation and the appearance of his workstation with customers coming in the office.

3. Kevin desk was completely covered with envelopes and brochures, incomplete applications, two boxes under his desk (stuff-phones books, brochures, etc.), a Xerox box top, posted notes everywhere on his bulletin boards and on his computer. The notes and paperwork were dated from the present back to May. His chair was covered with registry screens and more paperwork. The empty desk next to his had more registry screens and print-outs.

With Kevin I proceeded to review and remove the clutter and paper that had no relevance, this process over one hour. He had old expirations for next year and follow-up. Old quotes that he intended to follow-up next year. Some old service work which I immediately gave to Eileen Goldie to process. (ie:remove a car) I then gave him a rolodex for his post-note phone numbers and this removed three quarters of the paper notes from the wall area. We ordered two stand up files so he did not need a second desk for his paperwork. There was one application with a check which I insisted he complete so it could be processed.

Then, we met regarding his quarterly planner. His reason for poor performance this year was there was too much service and he did not get any help. And his back-up service rep Eileen was too busy. So I stopped the meeting and asked Laura Ashworth(service manager) to join us. Laura then reiterated that Kevin not only has Eileen but Tammi and Nancy plus everyone in the service team whenever he needs assistance. Also, to come to Laura whenever he needs service assistance. She then proceeded to tell Kevin that the service reps would appreciate him doing less service and pass the calls immediately to them. Because this creates more work and wastes the customers time.

So I had Kevin agreed to this streamlining of service problems along with claims calls should go to claims and so on. However, my concern is that he forgets, perhaps due to the medication, I am not sure. We have been over this with Kevin several times(for eight years according to Laura). Kevin said he has always been heavily involved with service and claims. I asked him too please pass the service and claims issues to the reps so the customer would get the best service we can possible give in a timely(immediate) fashion. Once again stressing the information on his desk was way over due and the best thing to do is to pass it on to be completed.

Please see quarterly planner for more information.

*Nina Schwitters*
Personal Sales Manager
South Easton, MA
1-800-442-8150 X110
fax (508) 238-5918
sdn 8-434-2110

2

LM 02454

# EXHIBIT C


**Liberty Mutual**

**Liberty Life Assurance Company of Boston**

Group Disability Claims
PO Box 1525
Dover NH 03821-1525
1-800-210-0268

July 19, 2004

Frisoli and Frisoli
Attorneys at Law
Attn: Frank J. Frisoli, Esq.
797 Cambridge Street
Cambridge, MA 02141

RE:   Kevin Tobin
      Liberty Life Assurance Company of Boston
      Short Term Disability
      Claim # 1206836

Dear Mr. Frisoli:

Your appeal request was received by this office on behalf of Kevin Tobin, and a thorough review of your request was conducted on behalf of the plan sponsor, Liberty Life Assurance Company. Based on the records contained in Mr. Tobin's Short Term Disability claim file, the original decision to deny benefits is being maintained.

Liberty Life Assurance Company's Short Term Disability Plan under which Mr. Tobin was covered, states that to receive benefits he must meet the following definition of disability and contains a provision concerning termination of coverage:

*"Total disability" or "Totally disabled" with respect to a covered employee means the inability to perform all of the material and substantial duties of his or her regular occupation on a full-time basis because of injury or sickness.*

*When Coverage Terminates*

*Your coverage terminates when you cease to be employed by the Plan Sponsor. Pay received in lieu of accrued Flexible Time Off/Personal Holidays will not extend your employment or coverage. Coverage also ceases when an employee changes to a different class of employment not eligible for this coverage (e.g., change to part-time status scheduled and regularly working less than 20 hours per week).*

Based on a review of the documentation contained in Mr. Tobin's Short Term Disability claim file, his last day worked was January 10, 2001. In his deposition, Mr. Tobin indicated that he was on a homeowners call that morning. In accordance with the above definition of disability, Mr. Tobin's date of disability was January 11, 2001; the first day he was unable to perform all of the material and substantial duties of his occupation.

Although Mr. Tobin may have had a medical condition, which he believed affected his work performance, he continued to perform the material and substantial duties of his occupation through his date of termination.

*Frisoli, Frank*
*July 19, 2004*
*Page 2*

Since Mr. Tobin was terminated from employment effective January 10, 2001, he was not employed by Liberty Life Assurance Company on his date of disability. Therefore, he was not covered by Liberty Mutual Insurance Company's Short Term Disability Plan on January 11, 2001 and we are unable to approve his claim.

This claim determination reflects an evaluation of the claim facts and plan provisions. The plan sponsor reserves the right to make a determination on any additional information that may be submitted.

Under the Employee Retirement Income Security Act (ERISA) Appeal guidelines, Mr. Tobin was entitled to appeal the determination made by Liberty Life Assurance Company of Boston (Liberty), and to submit any additional information wished to be considered as part of the appeal. Liberty has conducted a full and fair review of your appeal and accompanying materials, and have determined that the denial of benefits will be maintained.

At this time, Mr. Tobin's administrative right to review has been exhausted and no further reviews will be conducted by Liberty and his claim will remain closed. You may request to receive, free of charge, copies of all documents relevant to Mr. Tobin's claim. Mr. Tobin has the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

Nothing in this letter should be construed as a waiver of any Liberty Life Assurance Company of Boston rights and defenses under the above captioned Plan, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Determinations made by Liberty Life Assurance Company of Boston are based on the provisions outlined in Liberty Life Assurance Company of Boston's Short Term Disability Plan. These provisions are not contingent on decisions made by the Social Security Administration nor the Workers' Compensation Carrier.

Sincerely,

Dawn-Elynn Tillinghast
Appeal Review Consultant
(800) 210-0268 x38933
Fax: (603) 743-4794

# EXHIBIT D

# FRISOLI AND FRISOLI
## ATTORNEYS AT LAW

**797 CAMBRIDGE STREET**
**CAMBRIDGE, MASSACHUSETTS 02141**

(617) 354-2220 Telephone
(617) 354-6939 Facsimile

**FRANK J. FRISOLI, P.C.**
**LAWRENCE W. FRISOLI, P.C.**

**WENDY R. STANDER**

May 13, 2005

Dawn-Elynn Tillinghast
Appeals Review Consultant
Liberty Life Assurance Company of Boston
Group Disability Claims
P.O. Box 1525
Dover, New Hampshire 02821-1525

Re:    Kevin Tobin
       Liberty Life Assurance Company of Boston
       Short Term Disability
       Claim # 1206836

Dear Ms. Tillinghast:

As you are aware, this office represents Kevin Tobin.

Please forward to me a copy of the summary plan of the employee benefit plan for Mr. Tobin.

Please also forward to me a full set of the legal documents governing the plan.

Very truly yours,

Frank J. Frisoli

# EXHIBIT E



**Liberty Mutual.**

Liberty Life Assurance Company of Boston
Disability Claims
Employee Claims Unit
P.O. Box 1525
Dover, NH 03821-1525
Phone No.: (800) 210-0268
Secure Fax No.: (603) 743-4794

May 18, 2005

Frisoli and Frisoli, Attorneys at Law
Attn: Frank J. Frisoli
797 Cambridge Street
Cambridge, MA 02141-0000

RE:    Kevin Tobin
       Short Term Disability Benefits
       Liberty Mutual Insurance Co.
       Claim #: 1206836

Dear Attorney Frisoli:

We are in receipt of your May 13, 2005 request for information. Liberty Life Assurance of Boston provides Administrative Services Only for Liberty Mutual Insurance Company. As such, please contact Mr. Tobin's Benefit Representative for a copy of his Short Term Disability Benefits Plan.

Sincerely,

Dawn-Elynn Tillinghast
Appeal Review Consultant
Phone No.: (800) 210-0268 Ext. 38933
Secure Fax No.: (603) 743-4794